| iWOODARD, Judge,
dissenting.
I respectfully dissent from the majority’s decision because the hearing officer’s factual findings are not supported by the record, and her application of the law is misplaced.
The record clearly demonstrates that the employer, not only fully complied with its legal obligation but also, took thorough and extreme measures to accommodate Rao’s needs as defined by Rao. Nevertheless, Rao decided he did not wish to return to work for his employer and rejected the offer on the spot; thus, the employer filled the position. Arriving at these conclusions does not require disturbing the hearing officer’s credibility determination, since one need rely solely on written documents in evidence and Rao’s testimony. Consider first his testimony regarding the job offer and his rejection of it:
Q. During that meeting, Mr. McNabb discussed with you the fact that Mr. Grafton had made available a fuel truck driving position. Do you recall that?
A. Uh-huh. (Yes)
I2Q. And from that job, you would eventually go into hopefully your former position, correct?
A. Uh-huh. (Yes)
Q. And except there would be modifications, which would be simply light duty type work, simply supervision, no heavy work involved?
A. Right.
Q. And the job as a fuel truck driver would have paid you $9 per hour; is that correct?
A. Correct.
Q. And it was going to be a full-time job, correct, 40 hours per week?
A. Yes.
Q. After Mr. McNabb explained that to you, you told him, did you not, that you did not want to return to work for Gruñón?
A. Well, I felt like I didn’t want to go back. That’s true.
Q. And didn’t Stan at that point urge you to at least speak to Mr. Grafton before making up your mind?
A. He did.
Q. And at that point, you told him you just weren’t interested; isn’t that right?
A. Well, I guess you can say that, yes. [Emphasis Added.]
Yet, the hearing officer’s basis for finding that Rao was entitled to reinstatement of TTD benefits was that the job R & W offered “did not give claimant time to exercise his right to pursue the matter with his doctor and/or seek legal advice,” thus, it was not “in the spirit of rehabilitation.” The Workers’ Compensation Act does not appear to carve out such a legal “right,” nevertheless, it seems reasonable to afford an employee that opportunity if he or she requests it. On the contrary, in the case sub judice, the record shows that on Thursday, July 22, when the I,job offer was made to Rao and he was shown his doctor’s release to light duty, he not only emphatically refused to accept or to pursue the job offer, but also, he never requested time to check with his doctor or even suggested that he was interested in contacting his doctor. Consider again Rao’s testimony:
Q. During that conversation you had with Mr. McNabb, do you recall him indicating to you that Dr. Foster had returned you to work with certain restrictions?
A. He did say.
Q. Do you recall Mr. McNabb reviewing with you a couple of different forms *1007 that the doctor had signed, one was a physical capability form and the other was a job analysis form? Do you remember him showing those to you, going over that with you?
A. I believe so.
Q. The two forms that we’re discussing was both signed by Dr. Foster. You noticed that, didn’t you? You saw that, didn’t you?
A. Yes, I guess I did.
[[Image here]]
Q. Isn’t it also true that when you met with Stan McNabb in July, at the end of July, July 22nd, when he made this offer to you for the fuel truck driving position, isn’t it true that during that meeting you never raised any concern about whether or not Dr. Foster had, in fact, released you to return to work; isn’t that right?
A. That’s right. [Emphasis added.]
Additionally, on that same day, July 22, Grafton reiterated R & Ws job offer to Rao through a letter, which Rao confirmed receiving on July 28. The letter stated, in pertinent part, that:
We are pleased that you have reached maximum medical improvement and are doing so well that you have been released to return to work.
This letter is to confírm our appointment to meet with you on Monday, July 26, at 9:00 A.M. to address the job opportunities and any job |4modifications we have available that will satisfactorily acclimate you to the routine of a daily work schedule. [Emphasis added.]
As you know, before you can enter the refineries, you will be required by Conoco, Inc. to attend an 8-hour safety school (GSOP) certifying you to enter their premises as an employee of this company. The next available classes will be scheduled on Tuesday, July 27, 1993. This school is mandatory for all contractor employees. As with all other company employees, the cost of this school is company paid. Since these classes are mandatory, attendance time will be considered hours worked for payroll purposes. [Emphasis Added.] Upon completion of these classes, you will report to our maintenance shop on Miller Avenue. At this time, the only available job we have is Fuel Truck driver, at an hourly rate of $9.00 per hour. This job will not require any heavy or extreme physical labor. At your discretion, we are prepared to allow you to take any additional rest periods you determine to be necessary. [Emphasis Added.]
Available to you also will be an opportunity to attend CDL classes for the purpose of acquiring a professional driver’s license to operate the larger trucks we have in our operation; such as, dump trucks. These classes are also company paid. CDL qualification will not limit you to a truck drivers position but could serve as an interim position until a supervisory position becomes available to you at your original presurgery wage of $15.00 per hour. [Emphasis Added.]
I am sure you have valuable input to offer and I am looking forward to meeting with you on Monday.
Rao admitted that he did not attend the meeting with Grafton nor did he attend the company paid safety class nor did he call Grafton on Monday to inform him that he was not coming or that he wanted to confer with Dr. Foster before considering the job offer. From his testimony, it is also obvious that he did not even leave the impression that he would consider the position. In his words, “he wasn’t interested.”
The majority says that it was the employer’s responsibility to pursue Rao for an explanation regarding his failure to show up or to contact it, despite his clear expression of no interest. Not only is this to imply that “no” means “yes,” but there is no legal authority for this premise, nor, I submit, is it reasonable to put such a burden on employers under these circumstances when an employee clearly rejects an | Boffer and does not indicate a desire to consider it. The fact that there was a short period of time between the time the job was offered and Rao was to report in, and/or the employer filling the position, possibly would be relevant only had Rao intimated that he would consider the job *1008 but wanted to speak with his doctor or lawyer first and had the employer denied the request. Once the employer makes a bona fide offer and the employee refuses it, that should be the end of it, and at that moment the employer has the right to fill the position immediately and get on with running his or her business. The employer should have been able to fill the position Rao turned down at that moment he turned it down at his meeting with MeNabb, especially when Rao said he was not interested in talking with the employer before making up his mind. Notwithstanding, the employer went one step further and gave him another chance by making the offer in writing and inviting him to come to a meeting and the class.
The hearing officer and the majority relied on Foreman v. West Calcasieu Hospital, 625 So.2d 1104 (La.App. 3 Cir.1993) to justify a determination that the offer was not “in the spirit of rehabilitation” and that R & W’s job “was like no job was offered at all.” This is a misapplication of Foreman. In that case, the claimant suffered a work related injury on August 21, 1990. Eventually, the claimant’s treating physician released her to light duty work. In September 1991, the employer created a light duty job that was approved by her treating physician. The hours for the job were from 11:00 p.m. until 7:00 a.m. The claimant refused the job because she had a child not a year old who needed special care during those hours, some of which could not be provided by a babysitter, such as nursing. Upon claimant’s refusal, her employer terminated benefits. In affirming the hearing officer’s decision to reinstate her benefits, we outlined the hearing officer’s analysis in that case:
The job offered by the employer was unreasonable because the hours it was to be performed were between 11:00 p.m. and 7:00 a.m. Those | (¡hours were unusual. Claimant had not worked those hours prior to the injury. She had a baby to nurse and otherwise care for during those hours. If claimant did not have the maternal responsibility, then she might be reasonably expected to take the job. Or, if the job had been offered at different hours, it would have been a reasonable job offer regardless of her maternal duties. The fact that the light-duty job was sincerely created by the employer-which the Court believes to be true-is not the only burden that the employer had to meet. In an effort to reduce or terminate weekly benefits, an employer should be allowed a reasonable latitude in fashioning a job for a light-duty employee; but, in exercising such latitude, the employer cannot totally disregard the convenience of the injured employee to the point where the employee has no reasonable alternative but to turn the job down. Such was the case here.
The case sub judice is in no way like Foreman, supra. Grafton’s job offer would have allowed Rao to work the same hours as he did before, which would ultimately allow him to earn as much as he had before, and was in the same geographic location as his previous job. Also, R & W completely respected the convenience of Rao and was willing to fashion the position to suit Rao’s needs as determined by Rao. This can be clearly seen in Grafton’s July 22 letter to Rao in his statement that he would allow Rao, at his “discretion,” to take “any additional rest periods” that he deemed to be “necessary” in performing the job that was offered to him. Finally, in the case sub judice, there was no special circumstance which would make Grafton’s job offer to Rao unreasonable, as in Foreman, supra., where the claimant had a baby to nurse. Rao was offered a job he could physically perform, affording him an open ended opportunity to become rehabilitated. I fail to see what more an employer could be expected to do to satisfy the requirement of “in the spirit of rehabilitation.” Had Rao accepted the employer’s offer, and the employer had not complied with its offer, then Rao would have a valid complaint. However, there is nothing in the record to suggest that the employer would not have complied and/or was not making a sincere offer.
Gin upholding the hearing officer’s finding that the employer was arbitrary and capricious, the majority expresses its concern that “It appears that Dr. Foster had one level of activity in mind when he stated that plaintiff was ready to attempt to return to work and *1009 that defendant knowingly misconstrued Dr. Foster’s statements to its advantage.” There is absolutely nothing in the record to substantiate this conclusion. On the contrary, there is evidence that Rao, whether knowingly or inadvertently, misled his doctor as to the requirements of the job being offered. It is apparent that at one point, Dr. Foster was confused; however, that confusion was cleared up, resulting in Dr. Foster’s approval of the duties that would have been assigned to Rao.
Dr. Foster, in a letter, dated October 19, 1993, to Clint Dobson (adjuster) indicates, in part, that:
“I saw Mr. Rao on 10-19-93. I had released him to light duty, and it was my understanding that he would be employed in a supervisory position. However, the patient informed me that Mr. McNabb informed him that his job would be driving and operating a fuel truck and dump truck. Of course, as I have had some personal experience with this type of activity, I readily see there is a great deal of climbing, pulling on heavy hoses, and placing yourself in awkward positions in order to do so.... I felt that the patient should be able to do clerical, sedentary, or light duty, but climbing, bending, stooping or straining, etc., are definitely not activities that I would recommend.... It was my initial opinion that he could perform the activities of light or supervisory position, however the job which is described by Mr. Rao appears to be more formidable than sedentary or light duty. I don’t think, and to be candid, that he is able to do this particular type of work activity. I don’t believe that this gentlemen is capable of returning to work as a dump truck driver or a fuel truck operator/driver.... [Emphasis Added.]
Subsequently, McNabb met with Dr. Foster to address his concerns and clarify the employer’s intention regarding the offer. On November 9, 1993, McNabb wrote to Dr. Foster to confirm the substance and understanding of that meeting. This letter states, in part, that:
First of all, we did review and clarify the situation regarding the job modifications available to the client through the R.W. Equipment Company Organization. As you confirmed, the client’s attorney had \spontacted you, relative to the client’s ability to return to work and appropriate vocational options, and had, supplied you with his version of the client’s reservations regarding a return to work. In addition, the client was seen by you on 10/19/93. As your correspondence of that date confirms, the client reported to you that the position in question involved a great deal of climbing, pulling on heavy hoses, and placing himself in awkward positions. As we discussed, Mr. Rao’s description of the job is not accurate in the least, and is entirely different from the position that has been described by the employer. ... I was able to review with you the Job Analysis as obtained from the employer. As we discussed, the position of fuel truck operator is not representative of your understanding of a large fuel truck, and the one represented by Mr. Rao. As the Job Analysis confirms, the position involves driving a one-ton Chevrolet pickup truck with an automatic transmission. The truck does have an electric fuel pump, and the client is not required to manually pump fuel. Also, there are no heavy hoses to lift or pull. The fuel truck position involves using a 3/4 inch hose, 12 feet long, attached to a pump nozzle comparable with those in an ordinary filling station. Furthermore, all equipment operators are available during refueling to assist the client with any problems as they develop during refueling activities. Commonly, the only climbing involved is 24-36 inches in one to two step increments. The only equipment which requires refueling over 36 inches is that of backhoe. Backhoe tanks are directly in front of the driver’s seat, and the client could step up two to three steps, sit down, and then fuel the backhoe. If this fueling process is too physical for the client, Mr. Grafton has indicated that the backhoe operator could sit on his seat and fuel the equipment himself. We did review your experience and mine as a fuel truck operator and dump truck driver. As I discussed, dump truck driver positions now require very little in terms of manual labor, and involve primarily sitting and driving. Finally, I was able to confirm for you that the filling of the fuel trucks is coordinated through *1010 Pumpelly Fuel Products. The fuel truck operator, Mr. Rao in this instance, would drive to the loading dock, and have the fuel loaded into his truck. He would be able to sit during the entire fueling process, differ a review of all of the job duties actually involved in this fuel truck operator position, you did approve of the client returniny to work in this capacity. We did agree that the client is not capable of working in a capacity which requires a great deal of climbing, pulling on heavy hoses, and extensive bending, stooping, or straining. [Emphasis Added.]
Dr. Foster signed off on this letter on January 13, 1994, and prior to this, on November 5, 1993, apparently pursuant to his meeting with McNabb in November 1993, Dr. Fosters issues another “Job Analysis” form. On the section “Machines, Tools, Equipment,” Dr. Foster writes “Truck, electric pump.” In the section “Job Modifications Options-Comments,” Dr. Foster writes “Maximum climbing is 24" to |936". Backhoe fueling is by drivers seat-Equipment operators are available to help. No heavy lifting is required. No extensive standing/walking. Job modifications are available if necessary.” Finally, under the section “Client can perform this job with modifications,” Dr. Foster checks “yes.”
Further, regarding the issue of arbitrary and capricious, vis-a-vis the appropriateness of the employer’s termination of TTD benefits, the record shows that the employer, again, deferred to Rao and paid him more TTD benefits than he was entitled to by paying him until August 2, 1993, instead of July 22, 1993, when he refused the position. Rao’s benefits were reduced to SEB only after: (1) the receipt of Dr. Foster’s medical reports indicating that Rao had reached “maximum medical improvement” and had been released to light duty work; (2) the receipt of information that the job offered Rao had been approved by Dr. Foster; (3) Rao failed to show up at the meeting with Grafton and the safety school; and (4) the receipt of information that Rao had told McNabb that he would not return to work at R & W. Thus, Rao’s benefits were properly reduced to SEB, not only on the basis of Rao’s refusal to return to work, but also on competent medical reports and evidence of his ability to return to light duty and to perform the job.
R & W clearly met its burden of proof that Rao was physically able to perform the job and that the job was offered to him. Daigle v. Sherwin Williams Company, 545 So.2d 1005 (La.1989). Further, Rao did not produce clear and convincing evidence that he could not perform the job that Grafton offered him. La.R.S. 23:1221(3)(c)(ii). In fact, Rao testified that he could not deny that he was unable to perform that job. Additionally, the fact that, after the employer had filled the position, Rao tried to accept the offer is further substantiation that he could perform the job. The stipulation, mentioned by the majority, that Dr. Foster had never | ipreleased Rao is irrelevant, as it refers to a release ¡from Foster’s care, not regarding a release relative to Rao’s ability to return to work, as the aforementioned evidence establishes.
Thus, I see no basis in fact or in law for finding that this employer acted in an arbitrary and capricious manner and would reverse the hearing officer’s award of attorney’s fees and penalties, Mitchell v. Abbeville General Hospital, 93-1146 (La.App. 3 Cir. 4/6/94); 635 So.2d 540; Bradley v. Justiss Oil Company, Inc., 618 So.2d 646 (La.App. 2 Cir.1993), and award Rao SEB benefits in the amount of $160.00 per week.